1  Vanessa R. Waldref
2  United States Attorney
   Eastern District of Washington
3  Dan Fruchter
4  Devin C. Curda
   Assistant United States Attorney
5  James J. Hennelly
6  Trial Attorney
   Department of Justice, Consumer Protection Branch
7  Post Office Box 1494
8  Spokane, WA 99210-1494
   Telephone: (509) 353-2767
9

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 17, 2024

SEAN F. McAVOY, CLERK

10             UNITED STATES DISTRICT COURT
11        FOR THE EASTERN DISTRICT OF WASHINGTON

12  UNITED STATES OF AMERICA,         Case No.: 1:22-CR-02097-SAB-2

13                    Plaintiff,      Plea Agreement

14             v.

15  VALLEY PROCESSING, INC.,

16

17                    Defendant.

18

19        Plaintiff United States of America, by and through Vanessa R. Waldref,

20  United States Attorney the Eastern District of Washington, and Dan Fruchter,

21  Assistant United States Attorney for the Eastern District of Washington, James J.

22  Hennelly, Trial Attorney for the Department of Justice Consumer Protection

23  Branch, and Defendant Mary Ann Bliesner ("Defendant"), both individually and

24  by and through Defendant's counsel, Bevan Maxey, agree to the following Plea

25  Agreement.

26        1.    Guilty Plea and Maximum Statutory Penalties

27        Defendant agrees to enter a plea of guilty to Count 1 of the Indictment filed

28  on September 13, 2022, which charges Defendant with Conspiracy to Introduce

          PLEA AGREEMENT - 1

Adulterated and Misbranded Food into Interstate Commerce, in violation of 18 U.S.C. § 371, 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4).

Defendant understands that the following potential penalties apply:

    a.    a term of probation of up to five years;

    b.    a fine of up to $500,000, or twice the gross gain or gross loss from the offense, whichever is greater; and

    c.    a $400 special penalty assessment.

2.    <u>The Court is Not a Party to this Plea Agreement</u>

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

    a.    sentencing is a matter solely within the discretion of the Court;

    b.    the Court is under no obligation to accept any recommendations made by the United States or Defendant;

    c.    the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

    d.    the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

    e.    the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

    f.    the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

PLEA AGREEMENT - 2

3.    <u>Waiver of Constitutional Rights</u>

Defendant understands that by entering this guilty plea, Defendant is knowingly and voluntarily waiving certain constitutional rights, including the following:

      a.    the right to a jury trial;

      b.    the right to see, hear and question the witnesses;

      c.    the right to remain silent at trial;

      d.    the right to testify at trial; and

      e.    the right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands that Defendant retains the right to be assisted by an attorney through the sentencing proceedings in this case and any direct appeal of Defendant's conviction and sentence, and that an attorney will be appointed at no cost if Defendant cannot afford to hire an attorney.

Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

4.    <u>Elements of the Offense</u>

The United States and Defendant agree that in order to convict Defendant of Conspiracy to Introduce Adulterated and Misbranded Food into Interstate Commerce, in violation of 18 U.S.C. § 371, 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(1), (a)(3), (a)(4), (b)(3), and (b)(4), the United States would have to prove the following beyond a reasonable doubt:

      a.    First, beginning on or about October 29, 2012, and continuing until on or about June 30, 2019, in the Eastern District of Washington, there was an agreement between two or more persons to violate 21 U.S.C. §§ 331(a), 333(a)(2), 342(a)(1),

PLEA AGREEMENT - 3

(a)(3), (a)(4), (b)(3), and (b)(4) by introducing adulterated and misbranded food into interstate commerce;

    b.    Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

    c.    Third, one of the members of the conspiracy performed at least one overt act in the Eastern District of Washington on or after October 29, 2012, for the purpose of carrying out the conspiracy.

5.    <u>Factual Basis and Statement of Facts</u>

The United States and Defendant stipulate and agree to the following: the facts set forth below are accurate; the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea.

The United States and Defendant agree that this statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the Sentencing Guidelines computation or sentencing, unless otherwise prohibited in this Plea Agreement.

<u>Defendant</u>

At all relevant times, Defendant, Valley Processing, Inc. (VPI) was a Washington corporation located and headquartered at 108 Blaine Avenue, Sunnyside, Washington, 98944 (hereinafter the Blaine Avenue Facility) in the Eastern District of Washington. VPI manufactured single-strength fruit juice and fruit juice concentrate, including apple, pear, and grape juice products for customers worldwide. VPI's customers included at least two customers that purchased significant quantities of products for use in the USDA's School Lunch Program.

PLEA AGREEMENT - 4

At all relevant times, VPI's Blaine Avenue Facility included three manufacturing plants, known as "Plant 1", "Plant 2", and "Plant 3", an ambient conditions warehouse (known as the "Mojo Warehouse"), a cold room (the "Mojo Cold Room"), and freezers, office space, and other storage and facilities. In addition to the Blaine Avenue Facility, which was registered with the FDA, VPI also owned and operated juice product storage facilities located at 130 US Grape Road, Sunnyside, Washington (the "Grape Road Facility," also known as "the Hill") and a maintenance building at 105 South First Street, Sunnyside, Washington (the "Briner Building Facility"). During time periods relevant, Defendant, with the intent to mislead the FDA, concealed the Grape Road Facility and the Briner Building Facility by, among other things, not registering these facilities with the FDA, to prevent the FDA from inspecting or regulating these facilities.

At all relevant times, Defendant was a Washington corporation with its place of business in Sunnyside, Washington, in the Eastern District of Washington.

Relevant Food Safety Law

The FDA is a federal agency of the U.S. Department of Health and Human Services responsible for, *inter alia*, protecting public health by ensuring the safety of the nation's food supply chain. The Food, Drug, and Cosmetic Act (FDCA) vests primary responsibility for regulating and ensuring food safety in the United States in the FDA, which promulgates regulations, rules, and guidance, and conducts inspections, investigations, and audits regarding food safety.

At all relevant times, 21 U.S.C. § 321(f) defined "food" as, *inter alia*, articles used for food or drink by man or other animals, or components of such articles.

*Adulterated Food*

Under 21 U.S.C. § 342, a food is considered "adulterated" if, *inter alia*:

PLEA AGREEMENT - 5

a.  It contains any poisonous or deleterious substances which might render it injurious to health;

b.  It consists, in whole or in part, of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food;

c.  It has been prepared, packed, or held under insanitary conditions whereby it may have been rendered injurious to health;

d.  Damage or inferiority has been concealed in any manner; or

e.  Any substance has been added thereto or mixed or packed therewith so as to reduce its quality or strength, or make it appear better or of greater value than it is.

*Requirement for CGMP and HACCP Plans*

Federal food current good manufacturing practice (CGMP) regulations establish basic practices required to be followed, and conditions required to be maintained, by entities or individuals who receive, prepare, process, pack, hold, or distribute juice. 21 C.F.R. Part 117, Subpart B.  The purpose of CGMP is to ensure that food, including juice, is processed in a safe and sanitary manner and to prevent its adulteration. 21 C.F.R. § 120.5.

Juice processors are required to monitor, with sufficient frequency, their sanitation conditions and practices used during processing and storage to ensure, at a minimum, that they conform with CGMP regulations for manufacturing, packing, and holding human food. *See, e.g.,* 21 C.F.R. Part 117, subpart B, 21 C.F.R. § 120.6(b).  Juice processors are required to comply with CGMP in order to ensure that their facilities, methods, practices, and controls used to process and store juice are sanitary and safe and to prevent the adulteration of their juice products.  21 C.F.R. § 120.5; 21 C.F.R. Part 117, Subpart B.  For example:

a.  21 C.F.R. § 117.35(a) requires that buildings, fixtures, and other physical facilities of the plant must be maintained in a clean and sanitary condition

PLEA AGREEMENT - 6

1   and must be kept in repair adequate to prevent food from becoming
2   adulterated.

3      b. 21 C.F.R. § 117.35(c) requires that pests, including any objectionable
4       animals or insects including birds, rodents, flies, and larvae, not be
5       allowed in any area of a food plant, and that juice processors take
6       effective measures to exclude pests from the manufacturing, processing,
7       packing, and holding areas and to protect against the contamination of
8       food on the premises by pests.

9      c. 21 C.F.R. § 117.37 requires that every building or structure or parts
10      thereof, used for or in connection with the manufacturing, processing,
11      packing, or holding of human food, be equipped with adequate sanitary
12      facilities and accommodations including water supply, toilet facilities for
13      employees, and hand-washing facilities designed to ensure that an
14      employee's hands are not a source of contamination of food, food-contact
15      surfaces, or food-packaging materials.

16     d. Juice storage and transportation are required to be under conditions that
17      would protect against allergen cross-contact, as well as biological,
18      chemical, and physical contamination of food, as well as against
19      deterioration of the food and the container. 21 C.F.R. § 117.93.

20      Manufacturers, such as VPI, that process juice products that are sold as juice
21  or are used as an ingredient in beverages are also subject to the juice Hazard
22  Analysis and Critical Control Point (HACCP) regulations of 21 C.F.R. Part 120.
23  21 C.F.R. §§ 120.1 and 120.3(i)(1). "Juice" means the aqueous liquid expressed or
24  extracted from one or more fruits or vegetables, purées of the edible portions of
25  one or more fruits or vegetables, or any concentrates of such liquid or purée. The
26  purpose of HACCP regulations and plans is to prevent the occurrence of potential
27  food hazards in, or adulteration of, the juice. HACCP achieves this goal by
28  requiring juice processors to assess their processing operations (known as the

PLEA AGREEMENT - 7

hazard analysis), identify points in the process at which various hazards may occur (known as critical control points), and establish measures to control, prevent, or eliminate those hazards (known as critical limits).  *See* 21 C.F.R. §§ 120.7-120.13. The failure of a processor to have and to implement a Hazard Analysis and Critical Control Point (HACCP) system that complied with 21 C.F.R. §§ 120.6, 120.7, and 120.8, or otherwise to operate in accordance with 21 C.F.R. Part 120, renders the juice products of that processor adulterated under 21 U.S.C. § 342(a)(4).  21 C.F.R. § 120.9.

Under the juice HACCP regulations, each juice processor, including VPI, is required to develop a written hazard analysis to determine whether there are food hazards reasonably likely to occur during processing for each type of juice produced and to identify control measures that the processor can apply to control those hazards.  21 C.F.R. § 120.7(a).  Whenever a hazard analysis identifies one or more food hazards that are reasonably likely to occur during processing, the processor is required to have and implement a written HACCP plan to control the identified food hazards.  21 C.F.R. § 120.8.

Additionally, a juice processor's HACCP plan has to identify "critical control points" ("CCPs") in the juice manufacturing process at which a control measure can be applied that is essential to reduce an identified food hazard to an acceptable limit.  21 C.F.R. §§ 120.3(d), 120.7(a)(5).

For each CCP, the HACCP plan has to establish a "critical limit" *i.e.,* the "maximum or minimum value to which a physical, biological, or chemical parameter must be controlled . . . to prevent, eliminate, or reduce to an acceptable level, the occurrence of the identified food hazard."  21 C.F.R. §§ 120.3(e) 120.8(b)(3).

The juice HACCP regulation further requires that juice processors have and implement a sanitation standard operating procedure that addresses sanitation

PLEA AGREEMENT - 8

1  conditions and practices before, during, and after processing, in each location
2  where juice is processed. 21 C.F.R. § 120.6, 120.8(a)(1).

3      Because a juice processor is required to follow CGMP, HACCP regulations,
4  and HACCP plans in order to ensure that its products are safe, fit for human
5  consumption, and processed, packed, and held in sanitary conditions, juice
6  products that are processed, packed, or held out of compliance with CGMP
7  requirements, HACCP regulations, or a processor's HACCP plan are, by
8  definition, processed, packed, or held in insanitary conditions (and therefore are
9  adulterated) within the meaning of 21 U.S.C. § 342(a)(4).

10      Similarly, juice products are adulterated if the manufacturer's quality control
11  operations fail to ensure that food is safe or suitable for human consumption. *See*
12  21 C.F.R. § 117.1(a)(1)(ii); 21 C.F.R. § 117.80(a)(2).

13      *Misbranded Food*

14      At all times relevant to this Indictment, pursuant to 21 U.S.C. § 321(k), a
15  "label" was a display of written, printed, or graphic matter upon any article or any
16  of its containers or wrappers or accompanying such article. "Accompanying" an
17  article does not require physical attachment to the article and includes electronic
18  graphic matter. Moreover, if the article and the information are part of an
19  integrated distribution program, and the information is textually related to the
20  article, the information is labeling.

21      Pursuant to 21 U.S.C. § 343, a food is "misbranded" if, *inter alia*, its
22  labeling or packaging is false or misleading.

23      The Food, Drug, and Cosmetic Act prohibits, and subjects a juice processor
24  to criminal penalties, for introducing, delivering for introduction, or causing the
25  introduction or delivery for introduction, of misbranded food into interstate
26  commerce. 21 U.S.C. § 331(a).

27      *Requirement to Register a Food Facility with FDA*

28

    PLEA AGREEMENT - 9

1    Pursuant to 21 U.S.C. § 350d, the owner of any domestic facility where food
2    was manufactured, processed, packed, stored, or held was required to register and
3    bi-annually re-register with the FDA the name and address of each such facility.
4    Among the purposes of the registration requirement is so that FDA can
5    appropriately identify, regulate and, as necessary, inspect or audit each such
6    facility to ensure it is compliant with food safety law.
7    The Food, Drug, and Cosmetic Act prohibits, and subjects a juice processor
8    to criminal penalties for, failing to register a food facility with the FDA.  21 U.S.C.
9    §§ 350d, 331(dd).
10    *Contaminants in Fruit Juice*
11    Arsenic is a heavy metal that occurs in the environment from both natural
12    and human-made sources, including in soils, rocks, volcanic eruptions,
13    contamination from mining and smelting ores, and pesticides. Arsenic may occur
14    in both inorganic and organic forms, and inorganic arsenic is generally more toxic
15    than organic arsenic.  Inorganic arsenic has been known to cause cancer, skin
16    lesions, cardiovascular disease, neurotoxicity, diabetes, and other conditions in
17    humans.  Inorganic arsenic is a potential hazard for apple and pear juice products.
18    Because arsenic is a heavy metal, thermal processing, such as pasteurization, does
19    not destroy or reduce the amount of arsenic in juice or juice products.
20    Pasteurization is a heat treatment in which food is heated for a specified time to
21    temperatures below boiling point to reduce certain microorganisms.
22    Patulin is a mycotoxin produced by certain species of molds that may grow
23    on a variety of foods, including apples and pears.  Moldy, decaying, or damaged
24    apples and pears are particularly susceptible to having high levels of patulin and
25    patulin-producing molds.  If fallen fruit, moldy, rotten, bruised, or improperly-
26    stored apples are used to make juice, the juice may have high levels of patulin.
27    Thermal processing, such as pasteurization, does not destroy or reduce the amount
28    of patulin in juice or juice products.  While patulin is not reduced or eliminated by

PLEA AGREEMENT - 10

1   pasteurization, it can be destroyed by fermentation. Accordingly, patulin is

2   generally not found in alcoholic beverages such as hard ciders or in vinegar

3   products made from apple or pear juices.

4       Exposure to high patulin levels over time may pose health hazards in

5   humans, including nausea, vomiting, and gastrointestinal disturbances, as well as

6   immunological and neurological effects. FDA has established an action level for

7   patulin of 50 parts per billion ("ppb") in apple juice.

8       Other potential hazards in juice and juice products include yeast, mold,

9   bacteria (*e.g.*, *e. coli*), viruses (*e.g.*, norovirus), and other parasites (*e.g.*, the

10  protozoa parasite *cryptosporidium parvum*) (hereinafter microorganisms).

11  Microorganisms may cause a host of health issues, from food poisoning to, in some

12  cases, long-term reactive arthritis or other types of severe chronic illness. In some

13  cases, individuals have died from drinking contaminated juice. Some harmful

14  microorganisms can survive and thrive in acidic juices such as grape juice. While

15  thermal treatment such as pasteurization is a process used to reduce harmful

16  microorganisms from appropriately stored and processed juice, it is not a

17  sterilizing process and cannot be counted on to kill all microorganisms, nor can it

18  be used to "rescue" (*i.e.*, render fit for human consumption) juice that has not been

19  properly processed or stored or to make adulterated juice products non-adulterated

20  or safe for human consumption.

21      In addition to naturally-occurring microorganisms and other harmful

22  substances can be introduced during juice processing and storage in a variety of

23  ways. For example, tobacco use by employees, pests such as rodents and insects,

24  bird feathers and droppings, insect larvae, snails and slugs, the use of food

25  equipment for non-food purposes, and lack of, or failure to follow, sanitation

26  practices may all contribute to the introduction of potentially harmful contaminants

27  into juice. While some of these contaminants may be reduced through pasteurizing

28  (or re-pasteurizing) juice, others cannot be reduced. Pasteurizing juice is not a

PLEA AGREEMENT - 11

1  replacement for following food safety laws, HACCP plans, or CGMP but rather

2  one component of them.

### The USDA School Lunch Program

4      The USDA's School Lunch Program (sometimes referred to as the National

5  School Lunch Program or NSLP) is the nation's second-largest food and

6  nutritional assistance program.  The School Lunch Program provides free or

7  reduced-cost lunch to over 20 million children each school day.  USDA's research

8  indicates that children from food-insecure and marginally food-secure households

9  are more likely to eat School Lunch Program meals, and they receive more of their

10  food and nutrient intake from school meals than other children.  For many food-

11  insecure or marginally food-secure children, meals provided by the School Lunch

12  Program are frequently their primary and most reliable sources of nutrition.

### The Conspiracy

14      Beginning no later than October 29, 2012, and continuing until at least June

15  20, 2019, in the Eastern District of Washington, Defendant VPI, together with

16  other persons, including, but not limited to, certain of Defendant's owners,

17  officers, and employees, knowingly and willfully conspired and agreed to

18  introduce into interstate commerce, with the intent to defraud and mislead,

19  adulterated and misbranded food in violation of 21 U.S.C. §§ 331(a), 333(a)(2),

20  342(a)(3), (a)(4), (b)(3), and (b)(4).  It was the object of the conspiracy for VPI and

21  its known and unknown conspirators to unlawfully enrich themselves by

22  manufacturing, selling, and shipping in interstate commerce, adulterated and

23  misbranded juice concentrate and juice products to customers and consumers,

24  including to customers for use in the USDA's School Lunch Program.

### Manner and Means of the Conspiracy

26      It was part of the conspiracy that Defendant VPI, and its known and

27  unknown co-conspirators, and with the intent to defraud and mislead, knowingly,

28  willfully, and intentionally failed to follow CGMP, food safety regulations, and

PLEA AGREEMENT - 12

1   HACCP requirements and regulations in their production and storage of fruit juice
2   and fruit juice products, resulting in adulterated and misbranded juice products
3   being sold and shipped in interstate commerce.
4
5
6                           *Defendant's Blaine Avenue Facility*
7            It was further part of the conspiracy that Defendant VPI, and its known and
8   unknown co-conspirators, stored thousands of metal and plastic drums of grape
9   juice concentrate and other grape juice products in open air at ambient
10  temperatures at and outside the Blaine Avenue Facility, sometimes for years.  As
11  late as May 2018, some of these drums contained juice concentrate and juice
12  products that had been produced as early as 2011 and were stored outside at
13  ambient conditions and temperatures, rotting for years.  Defendant nonetheless
14  used some of these products to fill customer orders by either selling and shipping
15  the product as is, blending it with other product and fraudulently reassigning a new
16  lot number and production date, or "reworking" old product by rehydrating,
17  reprocessing, and re-pasteurizing it then fraudulently reassigning the "reworked"
18  product with a new lot number and production date.
19           It was further part of the conspiracy that Defendant VPI, and its known and
20  unknown co-conspirators, willfully and intentionally sold and shipped in interstate
21  commerce grape juice products that had been stored by Defendant at the Blaine
22  Avenue Facility in "cold storage" for many years, some of which had been
23  originally processed by Defendant, and its known and unknown co-conspirators, as
24  early as 2007.
25           It was further part of the conspiracy that Defendant held and stored the solid
26  sediment tartrates that settled at the bottom of the drums of grape juice concentrate,
27  sometimes referred to as grape "bottoms."  Defendant's employees removed the
28  liquid concentrate from the drums, leaving the grape "bottoms" filling

PLEA AGREEMENT - 13

1   approximately one-fourth of the drum.  Rather than immediately reprocessing,

2   disposing of, or properly storing the grape bottoms, Defendant, and its known and

3   unknown co-conspirators at times held grape "bottoms" for many years at ambient

4   temperatures and in insanitary conditions.  Defendant then "reworked" the old,

5   rotten, and moldy grape "bottoms" during periods of downtime at Defendant's

6   facilities, such as in between harvest seasons.  "Rework" involved adding water to

7   the grape "bottoms", pumping the mixture from multiple drums of grape "bottoms"

8   into a tank, and re-pasteurizing the mixture to make additional concentrate.

9   Defendant, and its known and unknown conspirators, with the intent to conceal the

10  age, adulteration, and inferiority of the product, then fraudulently assigned a new

11  lot number and production date corresponding to the date the grape "bottoms"

12  were "reworked", rather than the original processing dates.  Defendant then

13  fraudulently sold the resulting juice concentrate to customers as recently-produced

14  product.

15  *Defendant's Unregistered and Concealed U.S. Grape Road Facility*

16  Beginning at least as early as October 29, 2012, and continuing until at least

17  May 2, 2018, Defendant owned, operated, and used the Grape Road Facility,

18  located at 130 U.S. Grape Road, Sunnyside, Washington, to house, hold, and store

19  grape juice products including grape juice concentrate.  The Grape Road Facility,

20  which was located approximately three miles from the Blaine Avenue Facility, was

21  sometimes referred to as "U.S. Grape," "Grape Road" or "the Hill."

22  While Defendant registered the Blaine Avenue Facility with the FDA,

23  Defendant, with the intent to mislead the FDA, did not register the Grape Road

24  Facility with the FDA as required by federal food safety laws.  Defendant did not

25  register, and affirmatively concealed, the Grape Road Facility because Defendant

26  sought to hide the Grape Road Facility from FDA to prevent FDA from inspecting

27  or regulating it for compliance with food safety law and regulation.  Defendant

28

PLEA AGREEMENT - 14

1    failed to follow CGMP and food safety law and regulation and never implemented

2    a HACCP plan at the Grape Road Facility.

3        Defendant took affirmative steps to hide its storage and use of grape juice

4    products at the Grape Road Facility from FDA and its personnel.  These steps

5    included: (1) during various FDA inspections in 2015 to 2016, 2017, and 2018,

6    when questioned regarding facilities at which VPI was storing or processing fruit

7    juice products, Defendant and its employees, owners, and officers did not disclose

8    any other such facilities; (2) when, in Spring 2018, FDA learned of the Grape Road

9    Facility from confidential sources, Defendant, through its owners, officers, and

10    employees, denied that the Grape Road Facility was being used to store grape juice

11    product; (3) when, in Spring 2018, FDA indicated its intention to inspect the Grape

12    Road Facility after learning of it from confidential sources, Defendant's primary

13    owner and President advised employees that the FDA was coming to inspect the

14    Grape Road facility and authorized an employee to place cautionary tape around

15    the tanks (4) when, in Spring, 2018, FDA indicated its intention to inspect the

16    Grape Road Facility after learning of its existence from confidential sources,

17    Defendant's President and primary owner told FDA inspectors and instructed

18    employees to tell FDA inspectors that the facilities were unsafe to enter and that

19    they contained no juice or juice products.

20        Defendant kept earlier seasons' unsold grape juice concentrate in the Grape

21    Road Facility, sometimes for many years.  Defendant stored product, including

22    grape juice concentrate at the Grape Road Facility in: (1) a "cold room" used to

23    store 55-gallon drums of grape juice concentrate; (2) a structure containing two

24    refrigerated storage tanks referred to as "USG1" and "USG2", each with an

25    approximate capacity of 275,000 gallons; and (3) three 26,000-gallon capacity

26    open-top concrete tanks, referred to as G22, G23, and G24.  Tanks G22, G23, and

27    G24 were not kept in a temperature-controlled or refrigerated location, but instead

28

PLEA AGREEMENT - 15

1 | were open to the elements, and insufficiently cooled only by an air condenser that

2 | blew cool air across the top of the open 26,000-gallon storage tanks.

3 |      Product stored and held at the unregistered and undisclosed Grape Road

4 | Facility was adulterated, noncompliant with food safety law and regulation, unsafe,

5 | and unfit for consumption because of the product's age and the conditions at the

6 | Grape Road Facility. Product stored at the unregistered and undisclosed Grape

7 | Road Facility contained and consisted of fermented product as well as filthy,

8 | putrid, and decomposed substances, including visible mold, animal urine and feces,

9 | and decomposing corpses of birds, rodents, and insects. Defendant nonetheless

10 | moved product from the unregistered and undisclosed Grape Road Facility to the

11 | Blaine Avenue Facility and blended it with newer and less contaminated product to

12 | hide its age, adulteration and unsuitability for consumption. Defendant then

13 | blended the adulterated product for purposes of potential sale and shipping to

14 | unsuspecting customers.

15 |      During an FDA inspection of VPI in 2018, FDA inspectors took a

16 | photograph of a live rat in tank G24 at the Grape Road Facility, standing on top of

17 | the moldy and rotten juice concentrate, the top layer of which contained a layer of

18 | mold thick and hard enough for the rat to walk on. The photograph was taken

19 | approximately two months after Defendant had transferred over 105,000 pounds of

20 | grape juice concentrate from this same tank into 55-gallon drums to prepare a lot

21 | of grape juice concentrate for shipment and sale to customers in interstate

22 | commerce. However, because it did not meet customer specifications, this grape

23 | juice concentrate was never sold nor shipped in interstate commerce.

24 |      *Defendant's Unregistered and Concealed Briner Building Facility*

25 |      Defendant owned, operated, and used another facility, the Briner Building

26 | Facility located at 105 South First Street, Sunnyside, Washington, to house, hold,

27 | and store fruit juice and fruit juice products. The Briner Building primarily served

28 | as a maintenance building used to house maintenance supplies and equipment;

PLEA AGREEMENT - 16

however, Defendant also used the Briner Building Facility to store and hold fruit juice products, including grape juice concentrate stored in 55-gallon drums.

Defendant did not register the Briner Building Facility with the FDA as required. Defendant, with the intent to mislead, failed to register and affirmatively concealed the Briner Building Facility so that FDA could not inspect or regulate it.

Defendant stored for many years drums of fruit juice products at the Briner Building Facility in a room that had cooling units but which was not temperature controlled. Defendant nonetheless willfully and knowingly used these products in filling orders and sold and shipped them in interstate commerce, either by selling and shipping them outright; by blending them with other, newer products and reassigning them with a new lot number and production date corresponding to the later date on which the old product had been blended; or by "reworking" old product by rehydrating concentrate and then reprocessing and re-pasteurizing the product, and reassigning them with a new lot number and production date corresponding to the later date on which the old product had been "reworked."

*Defendant's False and Fraudulent Mislabeling, Documentation, and Sale to Customers*

Defendant then sold and shipped the adulterated, insanitary, unfit, and unsafe juice products that had been produced, packed, stored, and held at the Blaine Avenue Facility, the unregistered and undisclosed Grape Road Facility, and the unregistered and undisclosed Briner Building Facility, in violation of food safety laws and regulations, HACCP requirements, and CGMP, to unsuspecting customers, including for use in the USDA's School Lunch Program.

Defendant provided false Certificates of Analysis (CoAs) to customers to conceal the product's true age and adulteration. The false CoAs provided by Defendant included: (1) false and fraudulent representations regarding the production date(s) of the product; (2) false and fraudulent representations regarding the quality, fitness, and suitability of the product; (3) false and fraudulent

PLEA AGREEMENT - 17

representations that testing for patulin had been conducted and was "pending","

when in fact no testing was conducted; (4) false and fraudulent representations that

patulin testing was "pending" when in fact Defendant had no intent to provide, and

did not provide, the customer with the results of any patulin testing; (5) false and

fraudulent representations that the patulin test results were "<50 ppb"; that is,

below the FDA action level for patulin of 50 parts per billion (ppb), when in fact

patulin testing either was not conducted at all or was conducted and yielded results

greater than 50 ppb; (6) false and fraudulent representations that arsenic test results

were below FDA action levels when in fact arsenic testing was either not

conducted at all, or had been conducted and yielded results greater than the

applicable action level; and (7) false and fraudulent representations that yeast test

results (an indication of fermentation) were below specifications when in fact

testing yielded results greater than the applicable specification and in excess of

what was indicated on the CoA.

Defendant at times operated without HACCP plans; with inadequate plans;

in violation of its own HACCP plans; and in violation of the legal requirement that

it implement and follow a HACCP plan for each product type and at each location

at which Defendant produced, held, and stored juice products. For example,

Defendant never implemented a HACCP plan for storage at the Grape Road

Facility, nor to product juice using old grape "bottoms."

Defendant sold and shipped its products, including adulterated and

misbranded products, to domestic and international customers, including for use in

School Lunch Program meals primarily consumed by disadvantaged children at

public schools in the United States.

Overt Acts

Defendant, and Defendant's known and unknown conspirators, did commit,

and cause to be committed, acts in the Eastern District of Washington and

elsewhere, at least the following overt acts:

PLEA AGREEMENT - 18

a.     From at least as early as May 2017 until at least December 2017, Defendant's then-Vice President of Sales directed other employees to falsify CoAs and violate food safety law by selling and shipping in interstate commerce adulterated and misbranded apple juice concentrate with CoAs accompanying the shipment which misrepresented the arsenic content, including, for example, the following shipments:

| DATE | DESCRIPTION OF PRODUCT | ARSENIC CONTENT AND LABELING | INTRODUCTION IN INTERSTATE COMMERCE |
|---|---|---|---|
| On or about July 20, 2017 | Bill of Lading number 38315, Purchase Order 2017-00-46846 – approximately 9,986.69 pounds of apple juice concentrate from Lot Number 062417-B3 | Test report dated 7/6/17 indicates total arsenic content is 12 ppb. CoA does not list arsenic content. | Shipped from the Eastern District of Washington to the Central District of California |
| On or about July 24, 2017 | Purchase Order 4500283236-2 – approximately 4,089 pounds of apple juice concentrate from Lot number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | Shipped from the Eastern District of Washington to the Central District of California |
| On or about July 25, 2017 | Bill of lading 38228, Purchase Order 005062, approximately 42,443.43 pounds of organic apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to Etobicoke, Ontario, Canada |
| On or about August 1, 2017 | Bill of lading 3842, Purchase Order 4518216164, approximately 2,920.84 pounds of organic apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Central District of California |
| On or about August 26, 2017 | Bill of lading 38721, Purchase Order 149567, approximately 2,825.76 pounds of apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Central District of California |
| On or about September 1, 2017 | Bill of lading 38727, Purchase Order 50360, approximately 2,496.67 pounds of apple juice concentrate from Lot Number 070617-C6 | Test report dated 7/20/17 indicates total arsenic content is 17 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Eastern District of Louisiana |
| On or about September 19, 2017 | Bill of lading 38681, Approximately 8114.18 pounds of apple juice | Test report dated 7/6/17 indicates total arsenic content is 11 | From the Eastern District of Washington to |

PLEA AGREEMENT - 19

| | | | |
|---|---|---|---|
| | concentrate from Lot Number 062217-C5 | ppb. CoA does not list arsenic content. | Chungbuk, South Korea |
| On or about October 19, 2017 | Bill of lading 39153, Purchase Order 38536, Approximately 281.62 pounds of apple juice concentrate from Lot Number 062217-C5 | Test report dated 7/6/17 indicates total arsenic content is 11 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Southern District of Ohio |
| On or about November 27, 2017 | Bill of lading 39520, approximately 9,986.69 pounds of apple juice concentrate from Lot Number 070617-C6 | Test report dated 7/20/17 indicates total arsenic content is 17 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Central District of California |
| On or about December 7, 2017 | Bill of lading number 39554, approximately 4,993.34 pounds of apple juice concentrate from Lot Number 070617-C5 | Test report dated 7/20/17 indicates total arsenic content is 16 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the Northern District of Georgia |
| On or about December 22, 2017 | Bill of lading number 39713, Purchase Order 17-3142, approximately 28,161.60 pounds of apple juice concentrate from Lot Number 070617-C5 | Test report dated 7/20/17 indicates total arsenic content is 16 ppb. CoA does not list arsenic content. | From the Eastern District of Washington to the District of Kansas |

b.      Between on or about July 30, 2017, and in or around August 2018, Defendant sold and shipped 19 lots of apple concentrate to a customer in the Central District of California. Defendant produced the 19 lots by blending or reworking product from Lot Number 081916-C3, which Defendant originally produced in 2016. Defendant did not test Lot Number 081916-C3 for arsenic until on or about August 27, 2018, at which time the results showed that the samples from Lot Number 081916-C3 contained 26 ppb total arsenic -- above the FDA action level of 10 ppb.

c.      From at least as early as approximately 2014 until at least March 2017, Defendant's then-Vice President of Sales directed employees to falsify CoAs regarding patulin testing in apple juice products sold and shipped by Defendant. Defendant's former Vice President of Sales directed employees to list patulin testing as "pending" when in fact no testing was conducted, when testing revealed patulin levels above the FDA action level of 50 ppb, or when Defendant never

PLEA AGREEMENT - 20

1  intended to provide, and did not provide, testing results to customers.  Defendant's
2  former Vice President of Sales also directed employees to falsely list patulin
3  results as "<50 ppb" when Defendant had not performed patulin testing.  For
4  example, Defendant's former Vice President of Sales directed employees to falsify
5  CoAs for adulterated and misbranded products that Defendant shipped and sold in
6  interstate commerce to customers in the following shipments:

| DATE | DESCRIPTION | PATULIN TESTING AND LABELING | SALE AND SHIPMENT IN INTERSTATE COMMERCE |
|---|---|---|---|
| On or about April 29, 2015 | Sales Order 29863, for 5,800 gallons of apple juice from Lot Number 042915-J4 | Analytical test report indicates patulin content of 190 ppb, above FDA action level. CoA lists patulin testing as "pending" | From the Eastern District of Washington to the Central District of California to a customer for use in the USDA's School Lunch Program |
| On or about May 1, 2015 | Sales Order 29866, for 5,800 gallons of apple juice from Lot Number 050115-J3 | Analytical test report indicates patulin content of ~550 ppb, above FDA action level. CoA lists patulin testing as "pending". | From the Eastern District of Washington to the Central District of California to a customer for use in the USDA's School Lunch Program |
| On or about January 11, 2016 | Sales Order 32764, for 5,800 gallons of apple juice from Lot Number 011116-J3 | Patulin testing not performed. CoA lists patulin testing as "<50 ppb" | From the Eastern District of Washington to a customer in the Central District of California for use in the USDA's School Lunch Program |

    d.    From at least as early as the fall of 2012 until at least July 2018,
Defendant stored processed grape juice concentrate at the Grape Road Facility,
including in three open concrete tanks (G22, G23, and G24) that were
contaminated and adulterated with animal excrement, decaying insect and animals
and animal body parts, mold, yeast, rot, and filth.

    e.    From at least as early as October 29, 2012, until at least June 20,
2019, Defendant stored processed grape juice concentrate and grape "bottoms" in
55-gallon drums stored for years at ambient temperatures and conditions outside

PLEA AGREEMENT - 21

1  the Blaine Avenue Facility, including on a concrete pad under a "carport" between

2  two freezer buildings, and in other unprotected outdoor areas.  The drums stored

3  outside became and were contaminated and adulterated with yeast, mold, rot, and

4  other contaminants.  Many of these drums were not properly sealed and were not

5  fenced, enclosed, or otherwise protected from access by people, animals, or other

6  contaminants.  Some product in these drums were produced as early as 2011.

7  From at least as early as Fall 2012 until at least June 20, 2019, Defendant

8  "reworked" or blended these juice products to fill orders and ship to customers in

9  interstate commerce, thus concealing the age, adulteration, and inferior and unsafe

10  condition of the product.

11      f.      From at least as early as approximately 2018 until at least May 2019,

12  Defendants stored processed grape juice concentrate in the Briner Building Facility

13  for years in 55-gallon drums, which became and were contaminated and

14  adulterated with yeast, mold, rot, and other contaminants.

15      g.      Between at least the October 29, 2012 and May 2, 2018, Defendant,

16  with the intent to mislead, failed to register and disclose, as required by law, and

17  affirmatively concealed the Grape Road Facility from FDA.  Defendant further

18  failed to disclose the material fact that hundreds of thousands of gallons of

19  adulterated grape juice concentrate were being held at the Grape Road Facility in

20  unsafe and insanitary conditions.

21      h.      Between at least January 2013 and June 20, 2019, Defendant routinely

22  "blended" old, inferior, adulterated, and contaminated product, including, but not

23  limited to, product stored at and outside the Blaine Avenue Facility, and in the

24  Briner Building Facility, with newer product to mask its age, contamination,

25  adulteration, and poor quality.  The product stored at these locations was

26  adulterated because it had high yeast, high mold, and high aerobic plate counts

27  such that they were unsafe and unfit for human consumption.  Each time that

28  Defendant blended this adulterated product with newer product, the resulting

PLEA AGREEMENT - 22

blended product became adulterated.  Defendant nonetheless sold and shipped in interstate commerce the adulterated product to unsuspecting customers, including for use in the USDA's School Lunch Program.  Defendant misbranded the "blended" products by assigning them lot numbers and production dates that corresponded to the blending date, rather than the true, original date of production, to conceal the products' age, adulteration, and inferiority.

i.      On or about October 29, 2012, Defendant drew grape juice concentrate from Crop Year 2012 from Tank C2 located at the Blaine Avenue Facility and transported it to Tank USG2 located at the Grape Road Facility for long term storage for later use.  In this manner, Defendant stored at least 115,043 gallons of grape juice concentrate from Crop Year 2012 in Tank USG2.

j.      In the Fall of 2013, Defendant drew grape juice concentrate from the Blaine Avenue Facility and transported it to Tank USG1 at the Grape Road Facility for long term storage.  In this manner, Defendant stored at least 153,000 gallons of grape juice concentrate from Crop Year 2013 in Tank USG1.

k.      Between Fall 2012 and Fall 2014, Defendant transported tens of thousands of gallons of grape juice concentrate from Crop Years 2012, 2013, and 2014 to open-top concrete tanks G22, G23, and G24, located at the Grape Road Facility, for holding and storage for eventual use.

l.      Between Fall 2012 and June 2018, Defendant stored hundreds of thousands of gallons of grape juice concentrate from Crop Years 2012, 2013, and 2014 at the Grape Road Facility in Tanks USG1, USG2, G22, G23, and G24.

m.      Between at least 2014 and until at least June 20, 2019, Defendant instructed employees not to dispose of contaminated, adulterated, moldy, old, rotten, or unfit processed juice products, regardless of the condition of the product.  Instead, Defendant directed employees to store old, moldy, rotten, contaminated, putrid, filthy adulterated, and unsafe product for eventual "rework," re-pasteurization, or "blending."

PLEA AGREEMENT - 23

1    n.    Starting at a date unknown but between at least May 2017 and July

2    2018, Defendant held and stored product at the Grape Road Facility with no

3    HACCP plan and little, if any, sanitation whatsoever.  FDA testing confirmed that

4    the Grape Road Facility and product stored there was contaminated with live and

5    dead rodents, birds, and insects. The open and exposed concrete tanks and the juice

6    contained therein was contaminated with, among other things, thick mold, animal

7    remains, rodent excreta pellets, other animal feces, and feathers.  The layer of mold

8    at the top of the grape juice concentrate was so thick and hard that FDA inspectors

9    observed a rodent walking across it.

10    o.    On or about January 12, 2016, during an FDA inspection, Defendant's

11    President and primary owner told FDA inspectors that VPI consisted of three main

12    processing plants numbered 1, 2, and 3, and several storage buildings and outside

13    areas, all located at 108 Blaine Avenue, as well as three frozen storage buildings

14    located nearby.  Defendant's President and primary owner did not disclose the

15    Grape Road Facility and Briner Building as food storage areas, despite knowing at

16    that time that Defendant was storing hundreds of thousands of gallons of grape

17    juice concentrate at the Grape Road Facility.

18    p.    Between at least 2013 and May 2019, at the direction of Defendant,

19    Defendant's employees "reworked" old grape "bottoms" contaminated with mold

20    and filth.  Many of these grape "bottoms" were stored in 55-gallon drums at

21    ambient temperatures in unsafe conditions for multiple years.  Defendant's

22    employees added water to the "bottoms," pumped the rehydrated "bottoms" out of

23    the drums into a storage tank, and then decanted and re-pasteurized the resulting

24    mixture.  This process produced additional adulterated and misbranded juice

25    concentrate for Defendant to fraudulently sell.  Defendant then fraudulently

26    assigned a new production date and lot number to the resulting product, to falsely

27    make it appear as though it was new product and so that Defendant could sell the

28    product to unsuspecting customers.

PLEA AGREEMENT - 24

q.    Between at least October 2012 and May 2019, Defendant assigned lot numbers to products and their labels which reflected the date on which the product was produced and the storage location at Defendant's facilities.  For example, a lot of grape juice concentrate produced on May 25, 2013, and stored in Tank C6 at the Blaine Avenue Facility had a Lot Number 052513-C6.  Between at least January 2016 and May 2019, at Defendant blended or "reworked" old grape juice products into a new lot, fraudulently assigned a new lot number to conceal the true age of the older lot used.  Defendant did not appropriately track which lots were blended or reworked to create new lots, which prevented Defendant personnel and third parties from tracing products to the original lots or products from which they were derived.

r.    Between on or about April 26, 2018, and April 30, 2018, Defendant produced Lot Number 050218-C6 of Concord grape juice concentrate, and placed it into 240 55-gallon drums on or about May 2, 2018.   To produce Lot Number 050218-C6, Defendant "reworked" hundreds of drums of grape "bottoms" from 22 different lot codes from production years 2011 through 2016, including, but not limited to, the following lot codes: 114 drums from Lot Number 080315-C5 produced on or about August 3, 2015; 40 drums from Lot Number 101414-C2, produced on or about October 14, 2014, and stored outside the Blaine Avenue Facility at ambient temperatures for approximately three and a half years; and four drums from 102712-C2, produced on or about October 27, 2012, and stored outside the Blaine Avenue Facility at ambient temperatures for approximately five and a half years.  On or about May 8, 2018, six days after Lot Number 050218-C6 was produced, FDA inspectors took samples from what remained of three of the lots used to produce Lot Number 050218-C6.  Testing confirmed that the lots had fermentation-type odors, budding yeast, fungal mats, live mold, and insects.  Defendant then fraudulently assigned a new production date of May 2, 2018, and a new lot number, 050218-C6, to conceal the age and poor quality of the product.

PLEA AGREEMENT - 25

1  Defendant stored the resulting unsafe product in Cooler CA3, labeled it
2  "Settling/Blending" to allow the adulterated product to settle and then blend it in
3  with newer product to ship and send as grape juice concentrate.

4       s.     On or about March 5, 2018, and again on or about March 6, 2018,
5  Defendant transferred two tankers of grape juice from Crop Year 2012 containing
6  approximately 105,100 pounds of grape juice concentrate from the Grape Road
7  Facility to the Blaine Avenue Facility.  Before transporting the grape juice
8  concentrate, Defendant had stored this grape juice concentrate for years in open top
9  concrete tank G24 at the Grape Road Facility.  Defendant directed employees to
10  "rework" this adulterated juice product by adding water and then re-concentrating
11  it and placing it into approximately 144 55-gallon drums.  Defendant did not filter
12  or even re-pasteurize the grape juice concentrate before placing it into drums.
13  Defendant then reassigned these 144 drums with a production date of March 7,
14  2018, and a new Lot Number 030718-C2 in order to hide the age and adulteration
15  of the product.  Defendant labeled the product "for blending" to further conceal the
16  age and adulteration of the product and stored the drums outside the Blaine Avenue
17  Facility at ambient temperatures and conditions for use in future grape juice
18  concentrate lots.  Defendant added the resulting product at Lot Number 030718-C2
19  to Defendant's inventory database with a misleading production date of March 7,
20  2018, and to conceal that the product was actually produced in 2012 and stored for
21  years in an open-top concrete tank G24 at the Grape Road Facility.

22       t.     Approximately two months later, on or about May 9, 2018, after FDA
23  learned of the Grape Road Facility, FDA inspectors sampled the juice concentrate
24  remaining in tank G24 at the Grape Road Facility, which had been stored for years
25  in the same storage tank as the product that Defendant transferred to the Blaine
26  Avenue Facility to make Lot Number 030718-C2.  FDA's testing confirmed that
27  the concentrate in tank G24 contained fermentation, budding yeast, and filth,
28  including rodent hair, dog and cat hair, a feather barbule, and decaying insects.  On

PLEA AGREEMENT - 26

1    or about May 16, 2018, FDA inspectors confirmed through testing at least 29

2    rodent excreta pellets in the immediate surrounding areas adjacent to tank G24,

3    which was partially covered by a tarp and otherwise exposed to the environment.

4        u.    On or about March 9, 2018, Defendant created grape juice concentrate

5    Lot Number 030918-C6 by blending together:

6        i.    80 drums of Concord grape juice concentrate, Lot Number

7              110117-20K, pasteurized and produced on or about November

8              1, 2017, and then subsequently stored outside the Blaine

9              Avenue Facility in ambient conditions for at least four months;

10       ii.   8 drums of Concord grape juice concentrate, Lot Number

11             103017-C1, pasteurized and produced on or about October 20,

12             2017, and then subsequently stored outside the Blaine Avenue

13             Facility in ambient conditions for at least four months; and

14       iii.  Grape juice concentrate pumped from tank G18, which had

15             been pasteurized and produced in 2015, and subsequently

16             stored for approximately two and a half years.

17   Defendant did not re-pasteurize the adulterated blended product before placing it in

18   drums and fraudulently assigned a production date of March 9, 2018, to hide the

19   product's age, adulteration, and inferiority.  On or about March 14, 2018,

20   Defendant sold and shipped resulting Lot Number 030918-C6 from the Eastern

21   District of Washington to a juice company located in Ludington, Michigan, in the

22   Western District of Michigan.

23       v.    On or about April 30, 2018, during an FDA inspection, when FDA

24   inspectors asked where finished products were stored, Defendant's President and

25   primary owner described the storage locations at the Blaine Avenue Facility and

26   stated that all of Defendant's juice products were stored "on-site", within two to

27   three blocks of the Blaine Avenue Facility, and the buildings were "all connected".

28

PLEA AGREEMENT - 27

Defendant's President and primary owner did not disclose the Grape Road Facility or that it was, at that time, storing grape juice concentrate product.

w.     On or about May 2, 2018, during an FDA inspection, when FDA inspectors asked Defendant whether Defendant was blending old, contaminated, or poor-quality product, including product stored in drums outside the Blaine Avenue Facility, with newer product and assigning new lot numbers to the blended product, Defendant's President and primary owner stated "we don't use those, we haven't done that, no." This statement was inaccurate. Defendant was, during that time period, regularly blending old and lower-quality product with newer product and assigning new lot numbers to the blended product.

x.     On or about May 2, 2018, during an FDA inspection, when FDA inspectors, who had learned about the Grape Road Facility from confidential sources, asked about the Grape Road Facility, Defendant's President and primary owner stated "I don't know anything about anything up there." Defendant's President and primary owner further stated that the  storage rooms at the Grape Road Facility were "unsafe", "off-limits", and that it had been at least three years since it had been safe to enter the Grape Road  storage rooms. .

y.     Between on or about May 6, 2019, and May 8, 2019, Defendant's employees "reworked" drums of grape "bottoms" from "consolidation lots" that were produced and placed into drums on four different dates between May 2015 and February 2019. Each drum consisted of "bottoms" made from multiple lots with earlier production dates corresponding to the date on which the "consolidation lots" were placed into drums. Defendant's employees blended the drums of grape "bottoms" with 148 drums of a lot of grape juice concentrate which Defendant had produced four and a half years before on or about October 20, 2014. 150 of the 152 drums that were blended to produce this new lot had a history of outdoor storage outside the Blaine Avenue Facility at ambient temperatures and conditions.

PLEA AGREEMENT - 28

Defendant then assigned the resulting lot with a production date of May 8, 2019, and a new lot number, 050819-C2, to hide the age, adulteration, and inferiority of the product.

Between 2016 and 2019, Defendant received at least $742,139 in revenue from two customers, Ludfords, Inc., and Indian Summer Cooperative, Inc., for adulterated grape juice concentrate.

6.    The United States' Agreements

The United States Attorney's Office for the Eastern District of Washington agrees that at the time of sentencing, the United States will move to dismiss Counts 2 through 12 of the Indictment as to Defendant.

The United States Attorney's Office for the Eastern District of Washington agrees not to bring additional charges against Defendant based on information in its possession at the time of this Plea Agreement that arise from conduct that is charged in the Indictment, unless Defendant breaches this Plea Agreement before sentencing.

7.    United States Sentencing Guidelines Calculations

Defendant understands and acknowledges that the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") apply and that the Court will determine Defendant's advisory range at the time of sentencing, pursuant to the Guidelines. The United States and Defendant agree to the following Guidelines calculations.

a.    Base Offense Level

The United States and the Defendant agree that the base offense level is 6. U.S.S.G. §§ 8C2.3; 2N2.1(a) and (c); 2B1.1(a)(2).

b.    Special Offense Characteristics

The United States and the Defendant agree that because Defendant obtained at least $742,139 from its conduct, the offense level should be increased by 14 levels pursuant to U.S.S.G. §§ 8C2.3; 2N2.1(a) and (c); 2B1.1(b)(1)(H).  The United States and Defendant further agree that because Defendant employed

PLEA AGREEMENT - 29

1   sophisticated means in committing the offense, the offense level should be

2   increased by an additional 2 levels pursuant to U.S.S.G. §§ 8C2.3; 2N2.1(a) and

3   (c); 2B1.1(b)(10), resulting in a total adjusted offense level of 22.

4        The parties have no agreement whether any other specific offense

5   characteristics are applicable.  The United States and Defendant may argue for or

6   against any adjustments and/or enhancements under the USSG noted in the

7   Presentence Investigation Report.

8        The United States and Defendant agree that pursuant to U.S.S.G. § 8C2.4,

9   the base fine is $2,000,000.  U.S.S.G. § 8C2.4(d). The United States and Defendant

10  further agree that the culpability score for the Defendant is 8, pursuant to U.S.S.G.

11  §§ 8C2.5(b)(5), (e), and (g)(2).

12       c.    <u>No Other Agreements</u>

13       The United States and Defendant have no other agreements regarding the

14  Guidelines or the application of any Guidelines enhancements, departures, or

15  variances.  Defendant understands and acknowledges that the United States is free

16  to make any sentencing arguments it sees fit, including arguments arising from

17  Defendant's uncharged conduct, conduct set forth in charges that will be dismissed

18  pursuant to this Agreement, and Defendant's relevant conduct.

19       8.    <u>Probation</u>

20       The parties agree to that, because Defendant's financial obligations shall be

21  paid in full at or before sentencing and because Defendant is no longer a going

22  business concern, the Court need not impose a term of probation.  U.S.S.G. §

23  8D1.1.

24       9.    <u>Criminal Fine</u>

25       The United States agrees to recommend no criminal fine.  Defendant

26  acknowledges that the Court's decision regarding a fine is final and non-

27  appealable; that is, even if Defendant is unhappy with a fine ordered by the Court,

28  that will not be a basis for Defendant to withdraw Defendant's guilty plea,

PLEA AGREEMENT - 30

1  withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or

2  fine.

3

4      10.    Forfeiture:

5      The parties agree forfeiture applies. *See* 21 U.S.C. §§ 334 and 853(p) by way

6  of 21 U.S.C. § 331; 28 U.S.C. § 2461(c). With respect to forfeiture, the parties

7  agree to the following:

8          (a)    Money Judgment

9      Defendant agrees to forfeit to the United States all right, title, and interest in

10  the following property: a $742,139 money judgment payable at the time of

11  sentencing, which represents the estimated amount of proceeds Defendant obtained

12  as a result of her illegal conduct. The United States and Defendant agree that this

13  money judgment is joint and several with Defendant Mary Ann Bliesner.

14          (b)    Substitute Property

15      Defendant understands the United States may seek for Defendant to forfeit

16  substitute property in satisfaction of the money judgment if the United States can

17  establish the following regarding the above-described property (*i.e.*, the money

18  judgment): a) it cannot be located upon the exercise of due diligence; b) it has been

19  transferred or sold to, or deposited with, a third party; c) it has been placed beyond

20  the Court's jurisdiction; d) it has substantially diminished in value; e) it has been

21  commingled with other property and cannot be divided without difficulty. *See* 21

22  U.S.C. § 853(p). The United States will not seek to forfeit substitute property from

23  other defendants or co-conspirators; it may only forfeit substitute property from

24  Defendant. *See* 21 U.S.C. § 853(p).

25          (c)    Application of Forfeited Property to Restitution

26      Defendant understands the United States may seek restitution for the

27  victim(s) in this case independent of this money judgment. It is the parties' mutual

28  understanding that the United States Attorney's Office will seek approval to apply

PLEA AGREEMENT - 31

the proceeds of any forfeited assets to Defendant's restitution obligations. Defendant recognizes the final decision to approve this application rests with the Attorney General. *See* 18 U.S.C. § 981(d), (e); *see also* 28 C.F.R. 9 *et. seq.*

(d)    Cooperation on Forfeited Assets:

Defendant agrees to cooperate with the United States in passing clear title on all forfeited assets and to execute any and all forms and pleadings necessary to effectuate such forfeiture of assets. Defendant also agrees to assist the United States in locating any assets that 1) are the proceeds of illegal conduct (as outlined in this Plea Agreement) and 2) have not been dissipated. If such assets are located, then Defendant will stipulate to their forfeiture.

(e)    Waivers:

Defendant agrees to waive oral pronouncement of forfeiture at the time of sentencing. *See* Fed. R. Crim. P. 32.2(b)(4)(B).

Defendant stipulates and agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with the Plea Agreement on any grounds, including a claim that forfeiture in this case constitutes an excessive fine or punishment.

Defendant stipulates and agrees to hold the United States, and its agents and employees, harmless from any and all claims whatsoever in connection with the investigation, the prosecution of charges, and the seizure and forfeiture of property covered by this Plea Agreement.

(f)    Non-Abatement of Criminal Forfeiture:

Defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive her, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if Defendant had survived, and that determination shall be binding upon Defendant's heirs,

PLEA AGREEMENT - 32

successors and assigns until the agreed forfeiture, including any agreed money judgment amount, is collected in full.

### 11.   Mandatory Special Penalty Assessment

Defendant agrees to pay the $400 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, pursuant to 18 U.S.C. § 3013.

### 12.   Restitution

The United States agrees that no restitution is owing for any applicable victims.

### 13.   Additional Violations of Law Can Void Plea Agreement

The United States and Defendant agree that the United States may, at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its sentencing recommendation if, prior to the imposition of sentence, Defendant is charged with or convicted of any criminal offense or tests positive for any controlled substance.

### 14.   Waiver of Appeal Rights

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court.

Defendant expressly waives all of Defendant's rights to appeal Defendant's conviction and the sentence the Court imposes.

Defendant expressly waives Defendant's right to appeal any fine, term of supervised release, forfeiture, or restitution order imposed by the Court.

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

PLEA AGREEMENT - 33

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

15.    Withdrawal or Vacatur of Defendant's Plea

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

a.    this Plea Agreement shall become null and void;

b.    the United States may prosecute Defendant on all available charges;

c.    The United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

d.    the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and defenses Defendant might have to the United States' decision about how to proceed, including a claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including but not limited to, alleged violations of any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

16.    Waiver of Attorney Fees and Costs

PLEA AGREEMENT - 34

1  Defendant agrees to waive all rights Defendant may have under the "Hyde

2  Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys'

3  fees or other litigation expenses in connection with the investigation and

4  prosecution of all charges in the above-captioned matter and of any related

5  allegations (including, without limitation, any charges to be dismissed pursuant to

6  this Plea Agreement or any charges previously dismissed or not brought as a result

7  of this Plea Agreement).

8      17.   Integration Clause

9      The United States and Defendant acknowledge that this document

10 constitutes the entire Plea Agreement between the United States and Defendant,

11 and no other promises, agreements, or conditions exist between the United States

12 and Defendant concerning the resolution of the case.

13     This Plea Agreement is binding only on the United States Attorney's Office

14 for the Eastern District of Washington, and cannot bind other federal, state, or local

15 authorities.

16     The United States and Defendant agree that this Agreement cannot be

17 modified except in a writing that is signed by the United States and Defendant.

18                     Approvals and Signatures

19     Agreed and submitted on behalf of the United States Attorney's Office for

20 the Eastern District of Washington.

21 Vanessa R. Waldref
22 United States Attorney

23
24 _____          12/17/24
   Dan Fruchter                         Date
25 Assistant United States Attorney
26 _____          _____
27 James J. Hennelly                     Date
   Trial Attorney, Consumer Protection Branch
28

PLEA AGREEMENT - 35

1       I have read this Plea Agreement and I have carefully reviewed and discussed

2   every part of this Plea Agreement with my attorney.  I understand the terms of this

3   Plea Agreement.  I enter into this Plea Agreement knowingly, intelligently, and

4   voluntarily.  I have consulted with my attorney about my rights, I understand those

5   rights, and I am satisfied with the representation of my attorney in this case.  No

6   other promises or inducements have been made to me, other than those contained

7   in this Plea Agreement.  No one has threatened or forced me in any way to enter

8   into this Plea Agreement.  I agree to plead guilty because I am guilty.

9

10  _____     _____

11  Mary Ann Bliesner                                          Date

12  Defendant's Authorized Representative

13      I have read the Plea Agreement and have discussed the contents of the

14  agreement with my client. The Plea Agreement accurately and completely sets

15  forth the entirety of the agreement between the parties.  I concur in my client's

16  decision to plead guilty as set forth in the Plea Agreement.  There is no legal

17  reason why the Court should not accept Defendant's guilty plea.

18

19  _____     _____

20  Bevan Maxey                                                 Date

21  Attorney for Defendant

22

23

24

25

26

27

28

    PLEA AGREEMENT - 36